NOTICE

*The text of this opinion can be corrected before the opinion is published in the*
*Pacific Reporter.  Readers are encouraged to bring typographical or other formal*
*errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska  99501*
*Fax:  (907) 264-0878*
*E-mail:  corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| DANA RAY THOMPSON,<br><br>     Appellant,<br><br>  v.<br><br>STATE OF ALASKA,<br><br>     Appellee. | Court of Appeals No. A-11054<br>Trial Court No. 3AN-08-13856 CR<br><br><br>O P I N I O N<br><br><br>No. 2505 — June 24, 2016 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael R. Spaan, Judge.

Appearances:  Michael Schwaiger, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.  Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before:  Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge. [*]

Judge MANNHEIMER.

---

[*]  Sitting by assignment pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Dana Ray Thompson was convicted of multiple counts of first- and second-degree sexual abuse of a minor, plus multiple counts of exploitation of a minor and possession of child pornography.

Thompson's first-degree sexual abuse convictions were based on the alternative theories that he either (1) occupied a "position of authority" over his teenage victim as defined in AS 11.41.470(5), or that he (2) "resid[ed]" in the same household as the victim and had authority over her. *See* AS 11.41.434(a)(3)(A) & (B). In this appeal, Thompson contends that his jury was misinstructed regarding the meaning of these two terms ("position of authority" and "reside"), and thus his first-degree sexual abuse convictions should be reversed.

With regard to the meaning of "position of authority", we conclude that Thompson's jury was correctly instructed regarding this term.

With regard to the meaning of "reside", the trial judge failed to tell the jurors what this term meant. Instead, the judge allowed the attorneys to argue competing definitions of "reside" during their summations to the jury — and then, in response to a jury request for further instruction on the correct legal meaning of this term, the judge told the jurors that it was up to them to decide what "reside" meant. We agree with Thompson that the judge's actions constituted obvious error.

However, given the way the prosecutor argued this issue to the jury, we conclude that this error was harmless.

Thompson raises several separate double jeopardy claims — contending that many of his separate convictions must be merged. We agree with some of these double jeopardy claims. Specifically, we hold that Thompson's separate convictions for penetration of the victim's vagina with his fingers, his penis, and the insertion of "ben-wa" balls must merge, and we further hold that Thompson's separate convictions for exploitation of a minor and possession of child pornography must merge when they

are based on evidence that Thompson (1) took a sexually explicit photograph of his victim and then (2) kept this photograph.

*Underlying facts*

On appeal, Thompson does not challenge the allegations that he engaged in sexual conduct with J.C., but he argues that his crimes were of a lesser degree because he was not in a "position of authority" over J.C., and because he did not "reside" with her. For this reason, our statement of the underlying facts assumes the truth of the allegations of sexual conduct, and it focuses on the evidence describing the type of relationship that existed between Thompson and J.C.

Because Thompson challenges the sufficiency of the State's evidence to support his "position of authority" convictions, we present the evidence on that issue in the light most favorable to the jury's verdicts. [1]

When Dana Thompson was in his mid-forties, he maintained a sexual relationship with a teenage girl, J.C., from the time she was 14 years old (June 2005) until close to the time she was 18 (in the fall of 2008). Thompson was able to do this because he was living with, and taking care of, his mother Rita, and because J.C.'s mother Laura (we are using a pseudonym) often entrusted J.C. to Rita's care and, later, to Thompson's care for various purposes.

Laura met Rita at a meditation group in Anchorage, several years before J.C. was born. Rita provided emotional support to Laura, and Laura came to view Rita

---

[1] *See*, *e.g.*, *Augustine v. State*, 355 P.3d 573, 587 (Alaska App. 2015) ("The question on appeal is whether, viewing [the evidence] (and the reasonable inferences to be drawn from [it]) in the light most favorable to upholding the jury's verdicts, reasonable jurors could conclude that the State had proved its allegations beyond a reasonable doubt.").

as a mother figure. Although Laura later moved from Anchorage to Wasilla, Laura maintained her friendship with Rita. When J.C. was an infant, Laura would sometimes run errands in Anchorage and leave J.C. with Rita.

From the time J.C. was 4 years old until she was 10, Laura would travel to Anchorage once or twice a month to teach basket-weaving classes, or to run errands. During these trips to Anchorage, Laura would stay with Rita, and she would leave J.C. in Rita's care when she was teaching her class or running errands.

At this time, Laura knew Thompson (because he was Rita's son), but she had only limited interactions with him because he was not living with Rita. Laura's daughter J.C. met Thompson for the first time at Thompson's wedding, when she was 8 years old.

Despite their lack of familial relation, J.C. would call Rita "Grandma Rie", and she would call Thompson "Uncle Dana".

In 2004, Laura and J.C. moved to a remote cabin in Trapper Creek. In the winter, this cabin was accessible only by snowmachine or dog sled. J.C. was home-schooled, and after this move she rarely interacted with children her own age.

Also in 2004, Thompson moved in with his mother Rita. They lived in Rita's trailer, where Thompson had his own room.

In 2004 and 2005 (when J.C. was 13 and 14 years old), she would stay in Rita's trailer from one to five times per month, because her mother Laura would come to Anchorage to sell baskets at a Saturday market. Sometimes, Laura would drop J.C. off at Rita's trailer and return to Trapper Creek. During this time, Laura came to view Thompson as J.C.'s "personal bodyguard", and she entrusted him with making sure that no harm came to J.C. while the girl was staying in Anchorage.

The year 2004 also marked the beginning of Thompson's inappropriate behavior toward J.C. That year, J.C. went to Anchorage to attend an event connected to her home schooling program, but Laura could not leave Trapper Creek due to a snow storm. Laura called Rita to ask if J.C. could stay with her, and Rita agreed, so Thompson drove to retrieve J.C. from the event and bring her to Rita's trailer. During this ride, Thompson told 13-year-old J.C. that she had grown up, and he asked her about her bra size. Later that night, Thompson mentioned to J.C. that he wanted a sex slave.

When J.C. turned 14, Thompson began talking to J.C. about pornography and master-slave relationships. Thompson also showed J.C. adult pornography.

Beginning in 2005, Thompson's mother Rita began to experience a series of health problems that made it difficult for her to walk, so Thompson became Rita's caregiver. Thompson also became the person who was primarily in charge of maintaining the residence and looking after J.C. According to Laura's later testimony, "as [Rita's] health deteriorated, [Thompson] morphed into [the] person [who] was in charge of [J.C.], and in charge of her safety."

In June 2005, while J.C. was staying at the trailer, she and Thompson had their first sexual encounter. Thompson pulled J.C. onto his lap, shoved his hand down J.C.'s pants, and touched her genitals. J.C. started crying, and she curled up in a ball. When J.C. returned home to Trapper Creek the next morning, she did not tell anyone what happened because she was scared.

A week later, J.C. returned to Anchorage to stay at Rita's trailer for about two months (without her mother). J.C.'s home schooling program required her to obtain a job to earn "life skills" credit. To enable J.C. to fulfill this requirement, Thompson arranged a job for her at an Anchorage store called Rainbow Earth. J.C. also enrolled in a computer camp during this two-month stay in Anchorage.

On June 27, 2005, during the time that J.C. was staying at the trailer, Thompson's mother Rita was hospitalized. When Thompson returned to the trailer from the hospital, Thompson woke J.C. and demanded that she perform oral sex on him. Thompson also digitally penetrated J.C. and rubbed his penis against her body.

After the events of June 27, 2005, Thompson began engaging in more sexual activity with J.C. Also around this time, Thompson started taking nude and sexually suggestive photographs of J.C.

On J.C.'s fifteenth birthday, she and Thompson went to Planned Parenthood so that J.C. could obtain birth control. After leaving Planned Parenthood, J.C. and Thompson had multiple types of sexual intercourse.

After J.C. turned 15, she started staying more often at Rita's trailer without her mother, because her school work often required her to be in Anchorage. J.C.'s mother Laura would often communicate with Thompson to make sure that J.C. was completing her course work. During this time, J.C. and Thompson talked about getting married and having a family.

In the summer of 2006, J.C. spent approximately one continuous month living at the Anchorage trailer in order to prepare for a backpacking trip through the Arctic National Wildlife Refuge (as part of her home schooling program). Thompson helped J.C. with her school work and he also helped her physically train for her backpacking trip. During this time, J.C. and Thompson repeatedly had sex.

After J.C. returned from the backpacking trip, Thompson began renovating his room in the trailer to isolate it from the main part of the trailer, thus making it easier to hide his sexual relationship with J.C.

By the time J.C. was 16 years old, she was alternating every two weeks between living with her mother in Trapper Creek and living at the Anchorage trailer with Thompson and Rita.

Thompson's relationship with J.C. came to light in the summer of 2008, when J.C. spoke with a childhood friend who described being molested by an older man. J.C. "broke up" with Thompson and moved back in with her mother. J.C. eventually told her mother all that had happened between her and Thompson in Anchorage. Laura called the police, and this initiated the criminal investigation.

As part of the investigation, the police obtained a *Glass* warrant to record a conversation between J.C. and Thompson.[2] During this conversation, Thompson admitted to having a sexual relationship with J.C., beginning when she was 14 years old.

The police also obtained a warrant to search the Anchorage trailer. During their search, the police seized a digital camera and two memory cards. On these, the police found nude photographs of J.C. and two other children. (The State did not allege that Thompson took the photographs of these other children — only that he possessed them.)

Based on the foregoing, the State charged Thompson with eighteen counts of sexual abuse of a minor in the first degree (covering the time when J.C. was under the age of 16), based on the alternative theories that Thompson was either in a position of authority over J.C. or residing in the same household with her (or both).

The State also charged Thompson with ten counts of second-degree sexual abuse of a minor (covering the time when J.C. was between 16 and 18 years old), based on the theory that Thompson was in a position of authority over her.

In addition, the State charged Thompson with fifteen counts of child exploitation based on his acts of taking sexual photographs of J.C. while she was under

---

[2]   *See State v. Glass*, 583 P.2d 872 (Alaska 1978) (holding that, under the Alaska Constitution, the police must obtain a warrant before electronically monitoring or recording a private conversation, even when one or more participants to the conversation consent to the police surveillance).

the age of 18. And for each of these photographs, the State also charged Thompson with a separate count of possessing child pornography.

(The State also filed another five charges of possessing child pornography based on two photographs found in Thompson's possession that were not of J.C., and three photographs of J.C. that had been digitally altered.)

At Thompson's trial, the main points of contention were whether Thompson's relationship to J.C. constituted a "position of authority" for purposes of the sexual abuse statute, and whether J.C. had been "residing" at the Anchorage trailer.

The jury convicted Thompson of thirteen counts of first-degree sexual abuse, four counts of second-degree sexual abuse, and all of the counts of child exploitation and child pornography possession.

*Thompson's various attacks on the State's "position of authority" theory of prosecution*

All of the sexual abuse charges against Thompson contained the allegation that Thompson occupied a "position of authority" in relation to J.C. On appeal, Thompson challenges this element of the State's proof on various grounds.

Initially, Thompson asserts that *Wurthmann v. State*, 27 P.3d 762 (Alaska App. 2001) — this Court's primary decision interpreting the statutory definition of "position of authority" — was wrongly decided. Thompson asks us to overturn the interpretation of the statute adopted in *Wurthmann* and, instead, adopt the interpretation advocated in the *Wurthmann* dissent.

More particularly, Thompson argues that "position of authority" should be limited to adults who play a professional or quasi-professional role in caring for a child (as advocated in the dissent), and that "position of authority" should not include live-in

boyfriends or other members of the household who function as quasi-parents by virtue of "the dynamics of the household, the personalities of the individuals involved, and the amount of authority the legal or biological parent delegates". *Wurthmann*, 27 P.3d at 765.

We have considered Thompson's arguments, but those arguments are not so convincing as to clearly demonstrate that *Wurthmann* was wrongly decided. More specifically, we conclude that we would defeat the legislature's intent, rather than advance it, if we construed the statute so that it did not cover the situation presented in Thompson's case. Here, the evidence (viewed in the light most favorable to the State) showed that Thompson effectively functioned as J.C.'s surrogate parent or full-time sitter for weeks, and even months, while J.C. was living in Anchorage, away from her mother. We are convinced that the legislature intended the term "position of authority" to apply to an adult caretaker in these circumstances. We therefore stand by our decision in *Wurthmann*.

Thompson next argues that even if we adhere to the interpretation of AS 11.41.470(5) that we adopted in *Wurthmann*, we must still reverse his convictions because the trial judge gave the jurors an incorrect instruction on the meaning of "position of authority".

Here is the definition of "position of authority" contained in AS 11.41.-470(5). We have italicized the phrase that Thompson relies on to support his argument that his trial judge misinstructed the jury:

> "position of authority" means an employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, babysitter, *or a substantially similar position*, and a police officer or probation officer other than when the officer is exercising custodial control over a minor[.]

At the end of Thompson's trial, the judge gave the jurors an instruction — Instruction No. 31 — which defined the term "position of authority" in the words of the statute. But after the jurors began their deliberations, they sent a note to the judge asking for clarification of this definition — in particular, clarification of the language that we italicized above:

> We the jury would like to pose this question to you: Does "substantially similar position" pertain to the listed titles, or does it leave ... open to our consideration ... a broader list of authority figures/roles?

After consulting the attorneys, the trial judge answered the jurors as follows:

> The jury may consider a broader list of authority figures/roles in its deliberation[s,] but the roles must be substantially similar, not slightly similar, to the list in Instruction #31.

Thompson argues that the judge's response was incorrect — that it improperly allowed the jurors to consider whether Thompson's position *vis-a-vis* J.C. resembled *any type* of authority figure or authority role, even if that role was not listed in the statute.

We do not read the judge's response in that fashion, nor do we think there is any reasonable possibility that the jurors did either.

The judge told the jurors that, if they found that Thompson's relationship to J.C. did not put him in any of the authority roles specifically listed in Instruction No. 31 (*i.e.*, the ones specifically listed in AS 11.41.470(5)), then the jurors could consider whether Thompson's position amounted to some other authority role, but only

if that other authority role was "substantially similar" to the ones listed in Instruction No. 31.

This is precisely what the statutory definition says. We therefore conclude that the judge's answer to the jurors' question was proper.

Finally, Thompson argues that the State's evidence was not legally sufficient to support the conclusion that Thompson held a position of authority in relation to J.C. at the times specified in Counts 2 and 3 (June 27, 2005), Counts 5 through 7 (July through October 2005), Counts 11 through 13 (November 2005 through July 2006), and Counts 14 through 18 (August 2006 through October 27, 2006).

We have already summarized the State's evidence — in particular, the various times when J.C. stayed in the Anchorage trailer without her mother, and Thompson looked after her. The prosecutor's theory of this case was that Thompson occupied a position substantially similar to a "babysitter" during these times — one of the authority figures or roles specifically identified as a "position of authority" in AS 11.41.470(5).

In his brief to this Court, Thompson argues that the State's evidence did not necessarily prove that his role during these time periods was substantially similar to the role of a babysitter. But Thompson's argument hinges on viewing the evidence in a manner favorable to himself, while we are obliged to view the evidence in the light most favorable to the jury's verdicts. Viewing the evidence in that light, we conclude that it was sufficient to convince fair-minded jurors that the State had proved, beyond a reasonable doubt, that Thompson occupied a role substantially similar to that of a babysitter taking care of an older child during the specified periods of time. The evidence was therefore legally sufficient to establish the "position of authority" element of the charged crimes.

In sum, we reject all of Thompson's attacks on the State's "position of authority" theory of prosecution.

*Thompson's attacks on the State's "residing in the same household" theory of prosecution*

Of the twenty-eight sexual abuse charges against Thompson, the first eighteen charges involved allegations of sexual penetration that occurred before J.C. reached the age of 16. Each of these eighteen charges alleged alternative theories of the crime: first, that Thompson resided in the same household as J.C. and exercised authority over her, and second, that Thompson occupied a "position of authority" in relation to J.C.

In their summations to the jury, the prosecutor and the defense attorney argued differing interpretations of what it meant to "reside in the same household" as a child.

The defense attorney acknowledged that J.C. had stayed at Thompson's mother's trailer from time to time, but he argued that "[her] visits [were] temporary in duration ... , much the same [as] if you go and stay at a hotel." Overall, the defense attorney argued that the trailer could not have been J.C.'s residence because the word "reside" connotes "permanence".

In response, the prosecutor argued that the summer of 2005 was a two-month period of time when the Anchorage trailer was definitely J.C.'s "residence", even though the trailer might not have been her permanent residence. The prosecutor noted that J.C. lived continuously in the trailer during those months, working for Rainbow Earth. The prosecutor told the jurors that, according to the testimony, J.C. referred to

Anchorage as her "home" during this time, and J.C. listed Thompson's address (*i.e.*, the trailer's address) as her home address in her Planned Parenthood records.

Given the attorneys' differing positions as to whether the term "residence" should be limited to permanent residences, it is unsurprising that the jurors asked the judge for clarification of this issue. The jurors sent the following note to the trial judge:

> We the jury would like to request a legal definition of the word "residing".

When the judge consulted the attorneys about the jury's question, each of the attorneys (unsurprisingly) asked the judge to respond to the jury's question with an answer that favored their own position: the prosecutor advocated a flexible definition of "residing", while Thompson's defense attorney asked the judge to tell the jurors that a "residence" had to be permanent.

Unable to reach consensus, the trial judge decided to tell the jurors that the definition of "residing" was "a question of fact for [them] to resolve". Here is the judge's exact response to the jury:

> The definition of "residing" is a question of fact for the jury. Please refer to Instruction #2. Sorry I could not be of more assistance.

(The pertinent portion of Instruction No. 2 reads: "In considering the evidence in this case[,] you are not to set aside your own observations and experience in the affairs of life, but you have a right to consider all of the evidence in the light of your own observations and experiences.")

The judge's answer to the jury's question was obvious error. The proper interpretation of the word "residing" (as that term is used in AS 11.41.434(a)(3)(A)) is clearly *not* a "question of fact" for the jury to resolve. It is a question of statutory

interpretation — *i.e.*, a question of law. And as we held in *Roth v. State*, 329 P.3d 1023, 1026 (Alaska App. 2014), when a jury asks the court to clarify the meaning of a statute, it is the judge's duty to answer the jury's question — not tell the jurors that they must interpret the statute for themselves, using their "experience in the affairs of life".

We must next decide whether the judge's error — his decision not to tell the jurors what "residing" meant — might have affected the jury's verdicts in this case.

On appeal, Thompson no longer argues that a "residence" must be permanent. He acknowledges that the word "residing" can have many definitions, depending on the context and purpose of the underlying statute or regulation in which the word is used. But Thompson argues that, at least for purposes of Alaska's sexual abuse of a minor statutes, the word "residing" must be interpreted as referring to something other than "intermittent sojourning" or "crashing" at someone else's residence.

We do not construe the "residing" clause of AS 11.41.434(a)(3)(A) as requiring proof of a permanent abode. The purpose of this statute is to prohibit adults from improperly taking sexual advantage of children. Thus, the focus of the "residing" clause should be the nature and duration of the cohabiting relationship between the adult and the child, not the particular geographic location or locations where that cohabiting relationship takes place. For instance, a homeless or transient adult and child could "reside" together for years, even though they never stayed at one location more than a few days or weeks.

Because the focus of the statute is the cohabiting relationship, we agree with Thompson that the term "residing" should not cover any and all instances where a child might temporarily stay in the same dwelling as an adult (or vice-versa). But we conclude that, given the facts of Thompson's case, we need not decide the precise contours of "residing" for purposes of AS 11.41.434(a)(3)(A).

Thompson's case presents the following situation: At Thompson's trial, his attorney argued that a "residence" for purposes of the statute had to be permanent. The prosecutor argued that a person could "reside" at a location even though the residence was not permanent, and the prosecutor told the jurors that there had been two periods of time covered by the indictment when Thompson and J.C. resided together: the two-month period in the summer of 2005 when J.C. lived at the Anchorage trailer while she worked at Rainbow Earth, and the month in the summer of 2006 when J.C. was preparing for her trip into the Arctic National Wildlife Refuge.

The trial judge improperly refused to resolve this dispute — telling the jurors to figure out for themselves what "residing" meant. As a practical matter, though, the judge's error could only have affected the jury's resolution of one issue: whether the prosecutor was correct when she argued that Thompson and J.C. resided together during the two months in the summer of 2005 and the one month in the summer of 2006.

Thus, we need only decide whether, when Thompson and J.C. were jointly living in his mother's Anchorage trailer for two months in the summer of 2005, and for one month in the summer of 2006, this constituted "residing in the same household" for purposes of the sexual abuse statute. If the answer is "yes", then the judge's error in failing to give the jury a better definition of "residing" was harmless.

We conclude that, even viewing the evidence in the light most favorable to Thompson, Thompson's and J.C.'s cohabitancy of the trailer during the summer of 2005 and the summer of 2006 constituted "residing in the same household" for purposes of the first-degree sexual abuse statute. These were not brief visits or sleep-overs; J.C. was not temporarily "crashing" at the trailer before moving on. J.C.'s mother negotiated her daughter's weeks-long stays at the trailer so that her daughter could live in a residence where there were adults to take care of her and look after her while she fulfilled the requirements of her home schooling.

As we said earlier, we believe that the focus of the "residing in the same household" clause is the nature and duration of the cohabiting relationship between the adult and the child. Although this clause may not cover brief visits or sleep-overs, we conclude that it does cover the two-month and one-month living arrangements at issue here.

Accordingly, we conclude that the judge's error in Thompson's case was harmless beyond a reasonable doubt.

*Thompson's double jeopardy claims relating to his convictions for sexual abuse*

In *Erickson v. State*, 950 P.2d 580, 587 (Alaska App. 1997), this Court re-affirmed that the unit of prosecution in sexual assault and sexual abuse cases is the penetration of separate bodily orifices. That is, a defendant's penetration of separate orifices during the same criminal episode will support separate convictions.

Thompson argues that the *Erickson* decision was erroneous and should now be overruled. In recent years, this Court has repeatedly addressed this issue, and each time we rejected the argument that *Erickson* was so clearly erroneous that it should be overruled.[3] But more importantly, in *Johnson v. State*, 328 P.3d 77, 89-90 (Alaska 2014), the Alaska Supreme Court expressly endorsed the rule that "the harms from non-consensual sexual penetration of distinct orifices of the victim's body are so independently significant that multiple counts of sexual assault are permissible under the Alaska Constitution[.]"

---

[3]    *See Joseph v. State*, 293 P.3d 488, 492 (Alaska App. 2012); *Iyapana v. State*, 284 P.3d 841, 851-52 (Alaska App. 2012).

Because of the supreme court's decision in *Johnson*, we could not overrule *Erickson* even if we thought it was wrongly decided (which we do not).

Thompson next argues that even if the *Erickson* rule continues to define the proper unit of prosecution in sexual *assault* cases, the rule should be different in sexual abuse of a minor cases, at least where the sexual activity is not coerced by force or threat of force. We rejected this same argument in an unpublished decision, *Lincecum v. State*, 2012 WL 4039820 (Alaska App. 2012), and we again reject it here.

As we noted in *Lincecum*, both the sexual assault statutes and the sexual abuse statutes protect the same underlying societal interest: the prevention or punishment of socially unacceptable sexual acts. *Id.* at *4. In cases of sexual assault, the sexual conduct is prohibited either because it is achieved through coercion (direct application of force, or the threat of imminent force), or because the victim is incapacitated and either unaware that anything sexual is happening, or incapable of giving meaningful consent. In cases of sexual abuse, the sexual conduct is prohibited because the child is too young to meaningfully consent. We are not convinced that these distinctions imply, much less constitutionally require, a different rule defining the unit of prosecution.

Finally, Thompson argues that he should not have received separate convictions for penetrating the same orifice during the same episode of sexual activity.

Specifically, Thompson points out that he was convicted of three separate counts (Counts 8, 9, and 10) for an episode of sexual activity that occurred on October 28, 2005 — one conviction for penile penetration, one for cunnilingus, and one for digital penetration. Thompson was also convicted of three separate counts (Counts 11, 12, and 13) for sexual activity that occurred sometime between November 2005 and July 2006 — one conviction for penile penetration, one for digital penetration, and one for penetration of J.C.'s vagina with "ben-wa" balls — a device designed to produce or

enhance sexual stimulation. [4]  And Thompson was convicted of another three separate counts (Counts 14, 16, and 17) for sexual activity that occurred sometime between August 2006 and October 27, 2006 — one conviction for penile penetration, one for cunnilingus, and one for penetration of J.C.'s vagina with ben-wa balls.

Thompson argues that, for each of these three episodes, he should receive only a single conviction because the separate counts in each episode involved the same orifice.

We partially agree with Thompson. Under this Court's decision in *Oswald v. State*, 715 P.2d 276, 280-81 (Alaska App. 1986), digital penetration that accompanies penile penetration will not support a separate conviction. The State's evidence did not go into sufficient detail for the jurors to know whether Thompson's digital penetration of J.C. did or did not fall within the *Oswald* rule. Because the record does not affirmatively establish that the State was entitled to separate convictions, Thompson's convictions for digital and penile penetration must merge. *See Wiglesworth v. State*, 249 P.3d 321, 330 (Alaska App. 2011); *Simmons v. State*, 899 P.2d 931, 937 (Alaska App. 1995).

Attempting to avoid this result, the State asks us to overrule *Oswald*. We decline to do so.

Although we agree with Thompson that he should not have received a separate conviction for the digital penetrations, we reject his contention that his convictions for cunnilingus should also merge with his convictions for penile penetration. In *Yearty v. State*, 805 P.2d 987, 992, 995 (Alaska App. 1991), we treated cunnilingus as a form of sexual penetration that is distinct from penile or digital penetration of the female genitals. This is because, in *Murray v. State*, 770 P.2d 1131,

---

[4]  *See* https://en.wikipedia.org/wiki/Ben_Wa_balls.

1138-39 (Alaska App. 1989), this Court rejected the contention that cunnilingus requires proof of physical penetration of the genitals. Instead, we endorsed the view that cunnilingus encompasses "[all] sexual activity involving oral contact with the female genitals", regardless of whether that contact includes physical penetration. *Id.* at 1139.

In other words, cunnilingus is classified as a form of "sexual penetration" under AS 11.81.900(b)(60), not because it necessarily involves physical penetration of the genitals, but because the legislature concluded that it constituted a separately punishable form of sexual activity if performed without consent, or if performed on a person younger than the age of consent. For this reason, we reject Thompson's argument that his convictions for cunnilingus must merge with his convictions for penile penetration.

Thompson's remaining double jeopardy argument — the one involving his two convictions for inserting ben-wa balls into J.C.'s vagina — is more difficult to resolve.

Thompson argues that, because the unit of prosecution is the penetration of a particular orifice, he should not receive separate convictions for penetrating his victim's genitals with his penis and also penetrating her genitals with an object (the ben-wa balls) during the same episode. The difficulty is that the evidence at Thompson's trial leaves it unclear whether Thompson's use of the ben-wa balls (as charged in Counts 13 and 17) did, in fact, occur during the same episodes as his penile penetration of J.C.

According to J.C.'s testimony, Thompson used the ben-wa balls in two distinct ways. Sometimes, Thompson would have J.C. insert the ben-wa balls and then Thompson would engage in intercourse with her. But at other times, Thompson would make J.C. wear the ben-wa balls internally when they went to the movies or went grocery shopping.

This latter use of the ben-wa balls would clearly support separate convictions — because, in these instances, Thompson's use of the ben-wa balls was distinct from any act of penile penetration. But Counts 13 and 17 do not draw this distinction; they simply charge Thompson with the insertion of an object into J.C.'s vagina. And when the prosecutor argued these counts to the jury, she did not distinguish between (1) Thompson's use of the ben-wa balls in conjunction with acts of genital intercourse versus (2) the times when Thompson would have J.C. wear the ben-wa balls when she went out.

Because the record does not affirmatively establish that the jurors relied on this latter theory when they found Thompson guilty of Counts 13 and 17, Thompson's convictions on those counts must merge with his two related convictions for acts of penile penetration. *See Wiglesworth*, 249 P.3d at 330; *Simmons*, 899 P.2d at 937.

*Thompson's double jeopardy claims relating to his convictions for sexual exploitation of a minor and possession of child pornography*

Thompson began taking sexually suggestive or explicit photographs of J.C. when she was around 14 years old. He was ultimately charged with 15 counts of sexual exploitation of a minor (Counts 29 through 43) for photographs that he took between June 2005 and January 2006. [5]

Thompson was also charged with 20 counts of possessing child pornography (Counts 44 through 63). [6] Most (but not all) of those possession charges were paired with a related charge of sexual exploitation: Thompson was charged with sexual exploitation for taking the photograph, and he was charged with possession of

_____

[5]   AS 11.41.455(a).

[6]   AS 11.61.127(a).

child pornography for keeping the photograph in his possession. See Counts 29 through 43 (exploitation) and the related Counts 44 through 58 (possession).

Thompson argues that, for each of these pairs of convictions, the convictions must merge. He contends that his taking of the photographs and his ensuing possession of the photographs violate the same societal interests, and that they should be viewed (for double jeopardy purposes) as one criminal act.

The State responds that the sexual exploitation statute is aimed at a different societal interest from the child pornography statute. The State argues that the sexual exploitation statute protects minors from being sexually used and humiliated, while the statute prohibiting the possession of child pornography is aimed at preventing the distribution and possession of images that may incite future sexual abuse of children.

The State's second argument — that the social interest underlying the possession of child pornography statute is to suppress images that might incite future sexual abuse of children — is inconsistent with the United States Supreme Court's decisions dealing with the relationship of child pornography and the First Amendment.

The First Amendment limits the power of the government to enact criminal laws that prohibit the production and distribution of books, films, photographs, and the like. With regard to laws that prohibit the production of child pornography through the use of real children (like our sexual exploitation statute), or laws that prohibit the distribution and possession of this kind of pornography, the United States Supreme Court has upheld these laws against First Amendment challenges — concluding that the government has a compelling interest in (1) preventing the sexual exploitation of children that underlies the creation of this pornography, and in (2) destroying the market for this type of pornography by criminalizing the distribution and possession of it. *See New York v. Ferber*, 458 U.S. 747, 756-760; 102 S.Ct. 3348, 3354-56; 73 L.Ed.2d 1113

(1982), and *Osborne v. Ohio*, 495 U.S. 103, 109-110; 110 S.Ct. 1691, 1696; 109 L.Ed.2d 98 (1990).

However, in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234; 122 S.Ct. 1389; 152 L.Ed.2d 403 (2002), the Supreme Court suggested that protecting real children from sexual exploitation is the *only* government interest that is sufficiently compelling to outweigh First Amendment concerns.

*Free Speech Coalition* involved a First Amendment challenge to a statute that criminalized *simulated* child pornography — *e.g.*, pornography that depicted minors, but where the images were computer-generated, rather than made using real children. The government argued that this law should be upheld because even simulated child pornography might encourage the future sexual abuse or exploitation of real children, and because it might be used by pedophiles to encourage children to participate in sexual activity. *Id.*, 535 U.S. at 241, 122 S.Ct. at 1397. In other words, the government took the position that the social harm of this type of pornography "flow[ed] from the content of the images, not from the means of their production." *Ibid.*

The Supreme Court held that the government's argument was insufficient to overcome First Amendment concerns. The Court pointed out that, in instances where child pornography did not involve the exploitation of real children, the government's rationale for suppressing it was purely content-based. *Id.*, 535 U.S. at 253-54, 122 S.Ct. at 1403. That being so, the First Amendment prohibited the government from criminalizing this type of pornography unless its content was actually "obscene" (as that term is defined in First Amendment jurisprudence). *Id.*, 535 U.S. at 251-52, 122 S.Ct. at 1402. Because the criminal statute at issue in *Free Speech Coalition* applied to pornographic material that was not obscene, the Court held that the statute was unconstitutional. *Id.*, 535 U.S. at 256, 122 S.Ct. at 1405.

2505

(See *Ferrick v. State*, 217 P.3d 418, 421 (Alaska App. 2009), where we construed Alaska's child pornography statute in conformity with the Supreme Court's decision in *Free Speech Coalition*, holding that the government was required to prove that the pornography in the defendant's possession was actually generated through the conduct prohibited by the sexual exploitation statute, AS 11.41.455(a) — that is, generated by using a real child under the age of 18.)

We now return to the question in Thompson's case: whether he can lawfully be subjected to separate child pornography convictions for keeping the sexual photographs that he took of J.C., when he had been convicted of sexual exploitation for taking the same photographs. The State's rationale for imposing separate child pornography convictions is that Thompson's possession of these images, or his potential later distribution of them, might encourage future sexual abuse or exploitation of children.

But this is the same content-based rationale that the Supreme Court declared was inconsistent with the First Amendment in *Free Speech Coalition*. We therefore conclude that it would be improper for us to rely on this rationale as the justification for subjecting Thompson to separate exploitation and possession convictions for each of the photographs he took. These pairs of convictions must merge.

Thompson also argues that the double jeopardy clause requires a merger of any sexual exploitation convictions involving photographs that were taken during the same photo shoot. We reject this argument. In the statute forbidding the possession of child pornography, AS 11.61.127(c), our legislature expressly stated that every pornographic photograph in a person's possession constitutes a separate offense. We infer that the legislature likewise intended, for purposes of the sexual exploitation statute, that the defendant's creation of separate photographs will support separate convictions, even if those photographs are created during the same photo shoot.

*Conclusion*

For the reasons explained here, we uphold the jury's verdicts at Thompson's trial, but we conclude that many of his separate convictions must merge. And because these convictions are merging, we direct the superior court to re-sentence Thompson.

(Thompson has not challenged his sentence on appeal, so we do not retain jurisdiction of this case.)