Steven W. CABLE, Appellant,

v.

Don SHEFCHIK, d/b/a Fairbanks
Concrete Plumbing,
Appellee.

No. S–8264.

Supreme Court of Alaska.

Aug. 13, 1999.

Rehearing Denied Sept. 28, 1999.

Douglas Pope, Pope & Katcher, and R. Collin Middleton, Middleton & Timme, P.C., Anchorage, for Appellant.

John J. Tiemessen, Clapp, Peterson & Stowers, Fairbanks, for Appellee.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

### OPINION

MATTHEWS, Chief Justice.

## I. INTRODUCTION

Steven Cable severely injured his right hand when it was caught in the rotating "flapper valve" blade of a concrete pump owned and operated by Don Shefchik (doing business as Fairbanks Concrete Pumping). Cable sued Shefchik for damages. The jury returned a verdict in Shefchik's favor, finding that although Shefchik had been negligent, his negligence was not the legal cause of Cable's injuries. Cable's motion for a new trial was denied. His main contention on appeal is that the trial court erred by declining to instruct the jury on negligence per se. We agree and order a new trial.

## II. FACTS AND PROCEEDINGS

### A. Factual Background and Trial Testimony

Cable injured his right hand in the flapper valve of Shefchik's concrete pump. Cable was not employed by Shefchik, but accompanied him and his employee, Jeff Nicholson, on a construction job to "learn the ropes" in the event Shefchik needed to hire another worker.

The concrete pump is a large machine with a truck-mounted 225 horsepower diesel engine and sixty-four-foot boom. It pumps wet concrete through a transport line and deposits the concrete wherever the end of the line and boom are placed. Driven by hydraulic pressure, the flapper blades swing inside the flapper valve housing, controlling the flow of concrete within the pump. The pump's operation manual states repeatedly in bold letters, "Never place your hands in the valve housing."

The jury heard conflicting accounts about the events leading to Cable's hand injury.

### 1. Nicholson's testimony

Jeff Nicholson, who knew Cable, arranged for Cable to accompany him and Shefchik on a construction job on June 4, 1993. Nicholson testified that he told Cable the "do's and the don'ts" of working the pump and that he stressed that Cable should "never stick [his] hand in the flapper box." Nicholson explained that he had performed over one hundred clean-out operations on concrete pumps and had never used a guard to cover the opening to the flapper valve during such operations. He doubted that anyone could rake out unused concrete during clean-out with a cover over the flapper box. He also noted that on the day Cable was injured the pump lacked a warning sign over the flapper valve box even though a picture in the instruction manual depicted one. He acknowledged pictures in the manual depicting the flapper box without a cover guard.

According to Nicholson, prior to the accident both he and Cable were on the back of the truck conducting clean-out operations when Nicholson told Cable to "jump on down [off the truck] and let me finish cleaning this

up." Nicholson said he was using a hose to finish cleaning up and after he finished spraying, he looked up and saw that Cable had moved near the flapper valve box and had a "funny expression on his face." Nicholson jumped down from the truck and then realized that Cable had gotten his hand caught in the flapper box.

When asked by Cable's counsel what he would have done differently on the day of the accident, Nicholson said, "I'd have Steve with me ... at all times.... That way an unfortunate accident wouldn't [have happened]."

### 2. Shefchik's testimony

Shefchik testified that neither the truck nor the pump had warning signs about the dangers of the flapper valve, but he did not believe the lack of a sign contributed to Cable's accident. He also testified that he always told his operators never to place their hands in the valve.

He stated that he had performed between 500 and 1,000 clean-outs on the pump in over eight years and had never used a guard over the flapper valve in the process. Of the half-dozen other operators he had witnessed pouring concrete, he had never seen any of them use a guard on their pumps during clean-out. Much of Shefchik's testimony focused on the impracticability of using a guard during clean-out. He testified that the "manufacturer did not intend for that guard to be used while you were cleaning up.... There's not a doubt in my mind that if you put [the guard] over the flapper blade opening, you could not clean the pump out.... [Y]ou can't push concrete through [the] solid plate [of the guard]." Shefchik acknowledged that the manual says that the opening "shall be guarded at all times," but he said that the manual did not say anything about using the guard during clean-out.

### 3. Cable's testimony

Cable was the only eye-witness to his injury. He stated that he had "done a washout/clean-up type of operation" twenty-five to fifty times on concrete pumps with the same flapper valve configuration. But he said he did not know that the "flapper could snap on your hand." On the earlier occasions when Cable had cleaned out concrete pumps, he acknowledged that the pumps lacked guards and he expressed uncertainty about the possibility of performing clean-out operations with one in place.

Cable did not state with certainty how his injury occurred. He testified that he, not Nicholson, held the hose and was spraying the flapper assembly when "I fell forward and it just bit me." He was not sure how he fell forward, but he believed that "there was an outside force that kind of helped me there." Another heavy machine, a "front-end loader, had been banging around there for sometime and I—I think it had something to do with my being thrown into [the flapper valve]." Cable denied putting his hand in the flapper valve voluntarily. Testimony was also presented suggesting that he may have slipped and accidentally placed his hand in the flapper box.

Cable said that he did not remember Nicholson ever telling him to keep his hands out of the flapper valve. He also alleged that even though he claimed that he was lifted into the flapper valve by an outside force, seeing a warning sign to keep his hands out of the flapper box would have prevented his injury because "[s]eeing the warning may have re-advised me of just what a dangerous piece of machinery [the pump] was ... [and I] may have just very well stayed away from [the pump] altogether." He stated that despite his earlier deposition testimony that he did not think Nicholson was responsible for his injuries, he now believed that Nicholson "should have supervised me considerably more."

### 4. Other testimony

Cable's expert, Stanley Freeman, testified that after reviewing all the deposition testimony in the case he concluded that it would have been reasonable to have a guard over the flapper valve. He also asserted that Fairbanks Concrete Pumping "did not perform [its] duties to protect the safety of [its] employees properly" because of the absence of both a guard and warning signs. On cross-examination, Freeman admitted that he had formed his opinions, which were detailed in a deposition, about the utility of the guard on the pump before he had ever even seen a concrete pump in operation.

Dr. Harry Smith testified as a biomechanical expert for Shefchik. He said that given Cable's injuries, he probably reached or slipped into the left side of the flapper valve opening, although it conceivably could have been the right side of the valve. Smith also stated that the guard was "not useful." "[H]ow in the world are you going to clean that hole when there's a guard in front of it? You obviously have to take it off.... [Y]ou cannot clean the [flapper valve assembly] with the guard in front of it."

Other witnesses testified about the extent of Cable's injuries, rehabilitation, and lost income.

### B. *Procedural Issues*

Cable submitted three proposed negligence per se instructions, which referenced the Alaska General Safety Code (GSC) and the Alaska Construction Code.[1] The superior court declined to give any negligence per se instructions and instead instructed the jury that a violation of GSC section 01.0802 could be considered evidence of negligence.

The jury returned a verdict that Shefchik was negligent, but that his negligence was not the legal cause of Cable's injuries. Cable moved for a new trial on various grounds. The court denied the motion and entered judgment for Shefchik, including costs and attorney's fees. This appeal followed.

## III. *DISCUSSION*

### A. *The Superior Court Abused Its Discretion When It Declined to Instruct the Jury on Negligence Per Se.*

In determining whether a negligence per se instruction is appropriate, the superior court should conduct a two-step inquiry:

First, [the superior court] must decide whether the conduct at issue lies within the ambit of the statute or regulation in question, by applying the four criteria set out in the Restatement (Second) of Torts § 286 (1971).[2] This threshold determination is strictly a legal conclusion, and we will exercise our independent judgment in deciding whether the superior court interpreted the scope of the statute or regulation correctly.

Once it has concluded that the enactment applies to the allegedly negligent conduct, the superior court may exercise its discretion to refuse to give the negligence per se instruction. Such discretion is extremely limited, being confined to those "highly unusual cases" in which "laws may be so obscure, oblique or irrational that they could not be said as a matter of law" to provide an adequate standard of due care, or to those where the enactment amounts to little more than a duplication of the common law tort duty to act reasonably under the circumstances. The superior court's disposition of the question of whether the enactment was too vague or arcane to be utilized as a reasonable standard of care will only be reversed on appeal if it constitutes an abuse of discretion.[3]

Cable's proposed instruction 1B focused primarily on whether Shefchik violated section 01.0802 of the Alaska General Safety Code.[4] The superior court gave an instruction referring to this section, but declined to give

---

1. For greater detail on the content of the instructions, *see* section III.A. below.

2. Restatement (Second) of Torts § 286 (1971) provides:

    The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
    (a) to protect a class of persons which includes the one whose interest is invaded, and
    (b) to protect the particular interest which is invaded, and

    (c) to protect that interest against the kind of harm which has resulted, and
    (d) to protect that interest against the particular hazard from which the harm results.

3. *Osborne v. Russell,* 669 P.2d 550, 554 (Alaska 1983) (quoting *Harned v. Dura,* 665 P.2d 5, 12 (Alaska 1983)).

4. Cable's proposed instruction 1B stated, in relevant part:

    Plaintiff, Steven Cable, claims that the defendant, Don Shefchik, and his employee, Jeff Nicholson, were negligent because they violat-

a negligence per se instruction.[5] Upon Cable's counsel's request that it explain its decision, the court stated:

> I don't find it's negligence per se. I find it's one factor, and the jurors can utilize that in determining whether or not there is negligence under the facts of this case.... I find that the general safety provision is not necessarily, if it's violated, negligence per se. It's evidence of negligence. I can't make it clearer than that.

■ Under *Osborne*'s two-step inquiry, this ruling was erroneous. First, Cable's activities on the day he was injured lie "within the ambit" of the GSC provisions in the proposed jury instruction.[6] We have held that the GSC "is generally applicable to construction sites."[7] Also, despite Cable's status as Shefchik's invitee, rather than his employee, we have emphasized that certain provisions of the GSC are "directed toward the safety of the place of employment rather than toward the legal relationship existing between the employer and those who may be performing work on the premises."[8] Cable's activities were thus covered by the Alaska General Safety Code.

■ Second, the superior court abused its "extremely limited" discretion by refusing to give a per se instruction. The GSC provisions in instruction 1B were not "so obscure, oblique or irrational" that, as a matter of law, they could not provide an adequate standard of care.[9] In *State Mechanical, Inc. v. Liquid Air, Inc.*,[10] we held that the superior court did not abuse its discretion by giving a negligence per se instruction on a GSC provision, despite the provision's ambiguity, because the "GSC should be given a broad interpretation."[11] In the present case, the GSC provisions in proposed instruction 1B were neither ambiguous nor "obscure, oblique or irrational." In particular, GSC section 01.0802(a) establishes a detailed standard of care appli-

---

ed the provisions of the Alaska General Safety Code. The relevant provisions of law state as follows:

...

01.0802 GENERAL REQUIREMENTS FOR ALL MACHINES

(a) Machine guarding.

(1) Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two-hand tripping devices, electronic safety devices, etc.

(2) General requirements for machine guards. Guards shall be affixed to the machine where possible and secured elsewhere if for any reason attachment to the machine is not possible. The guard shall be such that it does not offer an accident hazard in itself.

(3) Point of operation guarding.

(A) Point of operation is the area on a machine where work is actually performed upon the material being processed.

(B) The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standard therefore, or in the absence of [an] applicable specific standard[], shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

If you decide that it is more likely true than true that the defendant, Don Shefchik, violated any part of this law and that the violation was a legal cause of the accident, then you are required to find the defendant negligent. Likewise, if you decide that it is more likely true than not true that Don Shefchik's employee, Jeff Nicholson, violated any part of this law and that the violation was a legal cause of the accident, then you are required to find Jeff Nicholson negligent. But if you find that neither the defendant nor Jeff Nicholson violated the law, then you should pay no further attention to this law and you should decide whether the defendant and Jeff Nicholson were negligent on the basis of the other instructions.

5.   The court's instruction stated, in part:

> If you decide it is more likely true than not true that the defendant violated any part of this law, you may consider this fact along with all the other evidence, including any evidence tending to show why the law was violated, in deciding whether under the circumstances of this case the defendant used reasonable care.

6.   See *Osborne*, 669 P.2d at 554.

7.   *State Mechanical, Inc. v. Liquid Air, Inc.*, 665 P.2d 15, 19 (Alaska 1983).

8.   *Bachner v. Rich*, 554 P.2d 430, 444 (Alaska 1976).

9.   *Osborne*, 669 P.2d at 554–55.

10.   665 P.2d 15 (Alaska 1983).

11.   *Id.* at 20–21.

cable to machine guarding.[12] In *Osborne*, we held that the superior court had "no area of discretion" in which to decline a negligence per se instruction because the regulations at issue "convey specific commands" about how electrical wires are to be insulated. For analogous reasons, the superior court abused its discretion in the present case by refusing to give a negligence per se instruction referring to GSC section 01.0802.

### B. *It Was Not Harmless Error for the Superior Court to Refuse to Instruct on Negligence Per Se.*

■■ In evaluating whether there has been prejudicial error with regard to jury instructions, "the reviewing court must put itself in the position of the jurors and determine whether the error probably affected their judgment."[13] We review this question de novo.[14]

■■ Shefchik argues that because the jury found him negligent, "any alleged error in the negligence per se instruction was harmless." This argument assumes too much. While it is true that the jury did find Shefchik negligent for something, it is not clear what that something was. Perhaps it was failing to supervise Nicholson and Cable more closely, or failing to post warning signs on the pump. On this record, however, we cannot presume, as Shefchik does, that because the jury had already found Shefchik negligent for some action he took or failed to take, it would not have also found him negligent for failing to place a guard over the flapper valve if the jury had been properly instructed on negligence per se.

12. See note 4, *supra*.

13. *Harris v. Keys*, 948 P.2d 460, 465 (Alaska 1997) (citation omitted).

14. *Id.* at 465–66.

15. *Godfrey v. Hemenway*, 617 P.2d 3, 8 (Alaska 1980).

16. The pattern negligence per se instruction of the Alaska Pattern Jury Instructions can serve as a model. It provides that violations may be excused if they result from the defendant's inability after reasonable care to comply with the law. See Alaska Civil Pattern Jury Instruction 3.04A (1988 Rev.).

The jury's determination of legal causation necessarily depends on the basis for the finding of negligence. Its definition of the precise character of Shefchik's negligence may have altered the jury's analysis of causation. For example, had the jury's finding of negligence been premised on the failure to use the guard, it is unclear how it could have concluded that this negligence was not a legal cause of the injury, since the evidence seems undisputed that the guard would have prevented the injury. In certain cases, "the difference between a negligence per se instruction and an ordinary negligence instruction is such that [the] error cannot be considered harmless."[15] Accordingly, we cannot say that the court's refusal to instruct on negligence per se constituted harmless error.

### C. *Remaining Issues*

1. *The negligence per se instruction at the new trial*

■■ Shefchik argued extensively at trial that it was not possible or practical to conduct clean-out operations of the pump with the guard on. The negligence per se instruction at the new trial should include a provision stating that Shefchik was negligent only if he committed an *unexcused* violation of GSC section 01.0802(a).[16] Such an instruction properly tracks the law of "excuse" as it relates to statutory and regulatory violations that are viewed as negligent per se. For example, in *Ferrell v. Baxter*[17] we adopted the Restatement (Second) of Torts section 288A(1) (1965), which states, in part: "An excused violation of a legislative enactment or an administrative regulation is not negligence."[18] The defendant has the burden of

17. 484 P.2d 250 (Alaska 1971).

18. See *Ferrell*, 484 P.2d at 263. The full text of the Restatement (Second) of Torts § 288A (1965), states:

(1) An excused violation of a legislative enactment or an administrative regulation is not negligence.
(2) Unless the enactment or regulation is construed not to permit such excuse, its violation is excused when
  (a) the violation is reasonable because of the actor's incapacity;
  (b) he neither knows nor should know of the occasion for compliance;

proving excuse in this context.[19]

2. *The superior court did not abuse its discretion by refusing to give proposed instructions 1A and 2.*

■ To avoid the need to relitigate the correctness of the superior court's refusal to give Cable's proposed instructions 1A and 2, we address this issue here. Both proposed instructions refer to section 05.090(a)(2)(A) of the Alaska Construction Code. Section 05.090, in relevant part, states:

05.090 Tools—Hand and Power.

(a) General Requirements.

(1) Condition of tools. All hand and power tools and similar equipment, whether furnished by the employer or the employee, shall be maintained in a safe condition.

(2) Guarding.

(A) When power-operated tools are designed to accommodate guards, they shall be equipped with such guards when in use.

The superior court deemed this section inapplicable to the case, concluding that because there was insufficient documentation at trial "that the [concrete] pump truck in question is a hand or power tool," its coverage was not "contemplated by the statute or the administrative regulation."

Cable argues that the court erred in rejecting these per se instructions by incorrectly interpreting the phrase "power operated tools."

Section 05.090 applies to handheld or portable power tools, not to heavy equipment machinery. It lists such tools as sanders, grinders, laminate trimmers, nibblers, shears, jigsaws, and drills.[20] The four subsections of section 05.090—"General Requirements," "Hand Tools," "Power-operated hand tools," and "Abrasive wheels and tools"—also list handheld portable tools.[21] No examples of heavy equipment or machinery are listed in section 05.090.

■ The doctrine of statutory construction, *ejusdem generis*, undermines Cable's argument for an expansive reading of section 05.090.[22] Thus, a general term, like "tool," when modified by specific terms, like "drills, saws and other hand tools,"[23] will be interpreted "in light of those specific terms, absent a clear indication to the contrary."[24]

Because the specific terms of section 05.090 refer only to handheld or portable tools, and because no indication exists that the regulation is meant to cover other types of tools, the superior court did not abuse its discretion in declining to give Cable's proposed negligence per se jury instructions which refer to Alaska Construction Code section 05.090.

## IV. CONCLUSION

The superior court's refusal to give a negligence per se instruction was reversible error. Accordingly, the jury's verdict is RE-

---

(c) he is unable after reasonable diligence or care to comply;

(d) he is confronted by an emergency not due to his own misconduct;

(e) compliance would involve a greater risk of harm to the actor or to others.

In the present case, § 288A(2)(c) would be the most relevant Restatement provision relating to Shefchik's actions. Comment g, which explains this clause, states: "Most legislative enactments and regulations are construed to require only reasonable diligence and care to comply with them; and if after such diligence and care the actor is unable to comply, his violation will ordinarily be excused."

**19.** *Id.* at 266.

**20.** *See, e.g.,* Alaska Construction Code § 05.090(a)(4)(A) & (B).

**21.** *See* Alaska Construction Code § 05.090(a),(b),(c), & (d).

**22.** *See Alaska State Employees Ass'n v. Alaska Public Employees Ass'n,* 825 P.2d 451, 460 (Alaska 1991) (*ejusdem generis*—"the general is controlled by the particular").

**23.** *See* Alaska Construction Code § 05.090(c)(3)(A).

**24.** *State Farm Fire & Cas. Co. v. Bongen,* 925 P.2d 1042, 1046 (Alaska 1996) (citing *Black's Law Dictionary* (6th ed.1990)).

VERSED and the case is REMANDED for a new trial.[25]

COMPTON, Justice, not participating.

---

25. Because we reverse, Cable's arguments that the superior court erred in denying his motion for a new trial and in disallowing his rebuttal testimony are moot.