*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | Supreme Court Nos. S-16624/16643 |
| Petitioner and | ) | Court of Appeals No. A-11054 |
| Cross-Respondent, | ) | |
| | ) | Superior Court No. 3AN-08-13856 CR |
| v. | ) | |
| | ) | O P I N I O N |
| DANA R. THOMPSON, | ) | |
| | ) | No. 7330 – January 25, 2019 |
| Respondent and | ) | |
| Cross-Petitioner. | ) | |
| | ) | |

Cross-Petitions for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael R. Spaan, Judge.

Appearances: Tamara E. DeLucia, Chief Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Petitioner and Cross-Respondent. Sharon Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Respondent and Cross-Petitioner.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.

# I.     INTRODUCTION

Dana Thompson was convicted of 13 counts of first degree sexual abuse of a minor and 4 counts of second degree sexual abuse of a minor stemming from a 4-year sexual relationship with the daughter of a family friend.  The first degree sexual abuse of a minor convictions were based on the alternative theories that Thompson either (1) occupied a "position of authority"[1] over the victim[2] or (2) resided in the same household as the victim and had authority over her.[3]

Thompson argued to the court of appeals that *Wurthmann v. State*,[4] the leading case interpreting the phrase "position of authority," was wrongly decided.  He alternatively argued that the jury was improperly instructed about the meaning of the

---

[1]     AS 11.41.470(5) provides: " '[P]osition of authority' means an employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, babysitter, or a substantially similar position, and a police officer or probation officer other than when the officer is exercising custodial control over a minor."

[2]     *See* AS 11.41.434(a)(3)(B).  An offender who is at least 18 years of age commits first degree sexual abuse of a minor if the offender engages in sexual penetration with a person under the age of 16 and, at the time of the offense, "occupies a position of authority" over the victim.

[3]     *See* AS 11.41.434(a)(3)(A).  An offender who is at least 18 years of age commits first degree sexual abuse of a minor if the offender engages in sexual penetration with a person under the age of 16 and, at the time of the offense, resides with and "has authority over" the victim.

[4]     27 P.3d 762, 766 (Alaska App. 2001) (holding that live-in boyfriend of sexual abuse victim's mother occupied a "position of authority" within the scope of AS 11.41.470(5)).

phrase "position of authority" under *Wurthmann*. The court of appeals rejected both arguments.[5]

Thompson also argued to the court of appeals that the superior court erred by failing to merge many of his convictions. The court of appeals rejected his argument that the rules for merger in sexual abuse of a minor cases should be different than the rules for merger in sexual assault cases. The court reaffirmed that for both types of cases the unit of prosecution is the distinct act of sexual penetration of different bodily orifices. But the court of appeals found that the superior court had misapplied the rules for merger and held that Thompson's convictions for digital penetration, penis-to-genital penetration, and penetration with an object during the same time period merged because the same orifice was involved and the evidence was ambiguous as to whether each act "accompanied" the other acts.[6]

The State petitioned for review of the court of appeals' merger ruling, advocating a rule allowing separate convictions for penetration with different objects or body parts, regardless of the time period. Thompson cross-petitioned. He argues that the court of appeals' rulings on "position of authority" — affirming *Wurthmann* and concluding that the jury was properly instructed — were erroneous; he also argues that the unit of prosecution for merger purposes should be the "sexual episode" and that many of his convictions should therefore merge.

We affirm the court of appeals' decision on both "position of authority" issues. We reject Thompson's argument that the unit of prosecution for sexual abuse of a minor cases and sexual assault cases should be different, and that more of his

---

[5]     *Thompson v. State*, 378 P.3d 707, 712-12 (Alaska App. 2016).

[6]     *Id.* at 716-17 (citing *Oswald v. State*, 715 P.2d 276, 280-81 (Alaska App. 1986), *recognized as overruled on other grounds by Yearty v. State*, 805 P.2d 987, 995 n.3 (Alaska App. 1991)), *reh'g denied* (Feb. 7, 2017).

convictions should therefore merge. We extend our recent decision in *Johnson v. State*[7] and hold that separate convictions and sentences may be imposed for each distinct act of penetration when either the penetrating object or body part or the penetrated orifice has changed. We reverse the court of appeals' holding that Thompson's convictions for digital penetration, penis-to-genital penetration, and penetration with an object during the same time period merged.

## II.    FACTS AND PROCEEDINGS

We adopt the facts outlined in the court of appeals' opinion.[8] We reproduce here the facts most relevant to the petitions before us:

> When Dana Thompson was in his mid-forties, he maintained a sexual relationship with a teenage girl, J.C., from the time she was 14 years old (June 2005) until close to the time she was 18 (in the fall of 2008). Thompson was able to do this because he was living with, and taking care of, his mother Rita, and because J.C.'s mother Laura[9] . . . often entrusted J.C. to Rita's care and, later, to Thompson's care for various purposes.
>
> . . . .
>
> Despite their lack of familial relation, J.C. would call Rita "Grandma Rie," and she would call Thompson "Uncle Dana."
>
> In 2004, Laura and J.C. moved to a remote cabin in Trapper Creek. . . . J.C. was home-schooled, and after this move she rarely interacted with children her own age.

---

**7**     328 P.3d 77, 89 (Alaska 2014).

**8**     *Thompson*, 378 P.3d at 709-11.

**9**     We have adopted the initials and pseudonyms used by the court of appeals to protect the privacy of the parties and witnesses.

Also in 2004, Thompson moved in with his mother Rita. They lived in Rita's trailer, where Thompson had his own room.

In 2004 and 2005 (when J.C. was 13 and 14 years old), she would stay in Rita's trailer from one to five times per month . . . . Sometimes, Laura would drop J.C. off at Rita's trailer and return to Trapper Creek. During this time, Laura came to view Thompson as J.C.'s "personal bodyguard[,"] and she entrusted him with making sure that no harm came to J.C. while the girl was staying in Anchorage.

. . . .

When J.C. turned 14, Thompson began talking to J.C. about pornography and master-slave relationships. Thompson also showed J.C. adult pornography.

Beginning in 2005, Thompson's mother Rita began to experience a series of health problems that made it difficult for her to walk, so Thompson became Rita's caregiver. Thompson also became the person who was primarily in charge of maintaining the residence and looking after J.C. . . .

In June 2005, while J.C. was staying at the trailer, she and Thompson had their first sexual encounter. Thompson pulled J.C. onto his lap, shoved his hand down J.C.'s pants, and touched her genitals. J.C. started crying, and she curled up in a ball. When J.C. returned home to Trapper Creek the next morning, she did not tell anyone what happened because she was scared.

A week later, J.C. returned to Anchorage to stay at Rita's trailer for about two months (without her mother). J.C.'s home schooling program required her to obtain a job to earn "life skills" credit. To enable J.C. to fulfill this requirement, Thompson arranged a job for her at an Anchorage store . . . . J.C. also enrolled in a computer camp during this two-month stay in Anchorage.

On June 27, 2005, during the time that J.C. was staying at the trailer, Thompson's mother Rita was hospitalized. When Thompson returned to the trailer from the hospital, Thompson woke J.C. and demanded that she perform oral sex on him. Thompson also digitally penetrated J.C. and rubbed his penis against her body.

After the events of June 27, 2005, Thompson began engaging in more sexual activity with J.C. . . . .

On J.C.'s [15th] birthday, she and Thompson went to Planned Parenthood so that J.C. could obtain birth control. After leaving Planned Parenthood, J.C. and Thompson had multiple types of sexual intercourse.

After J.C. turned 15, she started staying more often at Rita's trailer without her mother, because her school work often required her to be in Anchorage. J.C.'s mother Laura would often communicate with Thompson to make sure that J.C. was completing her course work. During this time, J.C. and Thompson talked about getting married and having a family.

In the summer of 2006, J.C. spent approximately one continuous month living at the Anchorage trailer in order to prepare for a backpacking trip . . . . Thompson helped J.C. with her school work and he also helped her physically train for her backpacking trip. During this time, J.C. and Thompson repeatedly had sex.

After J.C. returned from the backpacking trip, Thompson began renovating his room in the trailer to isolate it from the main part of the trailer, thus making it easier to hide his sexual relationship with J.C.

By the time J.C. was 16 years old, she was alternating every two weeks between living with her mother in Trapper Creek and living at the Anchorage trailer with Thompson and Rita.

Thompson's relationship with J.C. came to light in the summer of 2008 . . . . J.C. eventually told her mother all that

had happened between her and Thompson in Anchorage. Laura called the police, and this initiated the criminal investigation.

> . . . .

> . . . [T]he State charged Thompson with [18] counts of sexual abuse of a minor in the first degree (covering the time when J.C. was under the age of 16), based on the alternative theories that Thompson was either in a position of authority over J.C. or residing in the same household with her (or both).

> The State also charged Thompson with [10] counts of second-degree sexual abuse of a minor (covering the time when J.C. was between 16 and 18 years old), based on the theory that Thompson was in a position of authority over her.[10]

Thompson's case was tried in late May and early June 2010. In its closing argument the State emphasized that whether Thompson had knowingly engaged in sexual penetration with J.C., and whether she was under 16 and he was over 18 at the time, were not in dispute. The parties disputed only whether Thompson, at the time of the offense, either was in a position of authority in relation to J.C., or resided in the same household as her and had authority over her.

The relevant statute, AS 11.41.434(a)(3), provides:

An offender commits the crime of sexual abuse of a minor in the first degree if . . . being 18 years of age or older, the offender engages in sexual penetration with a person who is under 16 years of age, and

> (A) the victim at the time of the offense is *residing in the same household* as the offender and the offender has *authority* over the victim; or

---

**10**  *Thompson*, 378 P.3d at 709-11.

(B) the offender occupies a *position of authority* in relation to the victim.[11]

Another statute, AS 11.41.470(5), defines "position of authority" as: "an employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, babysitter, or a substantially similar position, and a police . . . or probation officer [in certain circumstances]."[12]

The State pointed out to the jury that "[t]here are two theories, the first is that she resided with him and he had authority over her, . . . [and the second is] that he occupied this position of authority that's set out in the definitions." In its consideration of the position of authority requirement, the State suggested that the jury "think of what . . . a position substantially similar to a babysitter would be"; it revisited this theme throughout closing arguments.

Thompson's argument recited the examples of position of authority from the statute and then urged the jury to focus on the fact "that each and every one of these positions is a professional or a quasi professional role. These aren't laypeople. You notice that parent [or] relative isn't included in here. These are people who have some position of authority by virtue of the title that they hold." Thompson argued that the evidence showed that Laura would not have entrusted J.C. to Thompson's care; that J.C. did not believe that Thompson was her babysitter or had authority over her; and that Rita, not Thompson, was the authority in the home when J.C. was at the trailer.

During deliberations the jury asked three substantive questions. The jury's first question was: "Instruction #31 could you please clarify 'substantially.' If someone

---

[11]     AS 11.41.434(a)(3) (emphasis added).

[12]     AS 11.41.470(5).

though[t] 'slightly' similar to one or more examples would this qualify?"[13]   After discussing the question with parties, the superior court responded:   "Please refer to Instruction 31."  A few hours later the jury asked:  "Does 'substantially similar position' pertain to the listed titles, or does it leave it open to our consideration of a broader list of authority figures/roles."  After again discussing the question and the statute's legislative history with the parties, the court responded:  "The jury may consider a broader list of authority figures/roles in its deliberation but the roles must be substantially similar, not slightly similar, to the list in instruction #31."  The next day, the jury asked a question about the definition of the term "residing."  After discussing the question with the parties, the court responded:  "The definition of residing is a question of fact for the jury.  Please refer to instruction number 2.  Sorry I could not be of more assistance."

The jury convicted Thompson of 13 of the 18 counts of first degree sexual abuse and 4 of the 10 counts of second degree sexual abuse.[14]

Thompson appealed the trial court's decision regarding the meaning of "position of authority" and related jury instructions, its refusal to merge some of his convictions for sentencing, and his sentence.  The court of appeals declined to revisit its interpretation of "position of authority" and affirmed the trial court's jury instructions, but reversed some of the merger decisions and remanded for resentencing.[15]

The State petitioned for our review of the court of appeals' treatment of the merger issues, urging us to define the unit of prosecution in sexual abuse cases as

---

[13]     Instruction #31 was based on the language of AS 11.41.470(5) and read: " 'Position of authority' means an employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, babysitter, or a substantially similar position."  *See* AS 11.41.470(5).

[14]     *Thompson*, 378 P.3d at 711.

[15]     *Id.* at 712-13, 716-18.

penetration by a distinct object or body part regardless of whether the same orifice was penetrated.[16] Thompson opposed the State's petition and filed a cross-petition, asking us to reexamine both the court of appeals' interpretation of "position of authority" and the trial court's and court of appeals' application of merger principles to his convictions. We granted both petitions.

## III.    STANDARD OF REVIEW

Statutory interpretation involves questions of law to which we apply our independent judgment.[17]   We review "[t]he correctness of jury instructions . . . de novo."[18]  "Whether two convictions should merge on double-jeopardy grounds is a mixed question of law and fact."[19]  We review de novo "[t]he ultimate legal question of merger under the double-jeopardy clause"; we review for clear error "the questions of fact underlying the conviction for the specific counts of statutory violations."[20]

---

[16]     We previously held in a sexual assault case that nonconsensual penetration of different orifices supports separate convictions. *Johnson v. State*, 328 P.3d 77, 89 (Alaska 2014).  But that case dealt with separate convictions for vaginal and oral penetration; it did not require us to consider merger issues for penetration of the same orifice by different objects or body parts. *Id.* at 86.

[17]     *State v. Fyfe*, 370 P.3d 1092, 1094 (Alaska 2016).

[18]     *Lindbo v. Colaska, Inc.*, 414 P.3d 646, 650 (Alaska 2018) (quoting *Ayuluk v. Red Oaks Assisted Living, Inc.*, 201 P.3d 1183, 1197 n.30 (Alaska 2009)); *see Thompson v. Cooper*, 290 P.3d 393, 398 (Alaska 2012) ("Jury instructions involve questions of law to which we apply our independent judgment.").

[19]     *Johnson*, 328 P.3d at 81.

[20]     *Id.*

## IV. DISCUSSION

### A. The Facts Of Thompson's Case Do Not Implicate *Wurthmann v. State*.

Thompson first asserts that *Wurthmann v. State*[21] was wrongly decided and that we should "hold that 'position of authority' is limited to people in professional or quasi-professional roles that are either listed in the statute or are substantially similar to the professional or quasi-professional positions listed in the statute."

In *Wurthmann* the defendant was convicted under former AS 11.41.438(a)(2) of third degree sexual abuse of a minor for having sexual intercourse with the daughter of the woman with whom he lived when the victim was 16 and 17 years old.[22] Wurthmann argued that his convictions should be reversed because he did not occupy a "position of authority" over the victim, as required by the statute.[23] The court of appeals, however, noted that Wurthmann had "assumed the role of [the victim's] stepfather" and "primary caretaker."[24] Under these circumstances, the court of appeals determined that a "live-in boyfriend who assumes the position of a stepfather" might exert enough influence over the victim to occupy a position of authority as it applies to

---

[21]  27 P.3d 762 (Alaska App. 2001).

[22]  *Id.* at 763-64. An offender was guilty of third degree sexual abuse of a minor under former AS 11.41.438(a)(2) if the offender, "being 18 years of age or older, . . . engage[d] in sexual penetration with a person who [was] 16 or 17 years of age and at least three years younger than the offender, and the offender occupie[d] a position of authority in relation to the victim." The statute was later recodified as sexual abuse of a minor in the second degree at AS 11.41.436(a)(6) (2006). *See* Ch. 88, § 1, SLA 2006; Ch. 14, § 1, SLA 2006.

[23]  *Wurthmann*, 27 P.3d at 764.

[24]  *Id.* at 763.

the sexual abuse context.[25]

In contrast, Thompson was charged under alternative theories of first degree sexual abuse of a minor for engaging in sexual penetration with J.C. when she was under the age of 16. The indictment alleged that at the time of the offenses, either she resided in the same household with Thompson and he had authority over her, or else he occupied a position of authority in relation to her.[26] The State did not allege, as in *Wurthmann*, that Thompson's authority was based upon his assuming "the role of [the victim's] stepfather."[27]

Thompson argues that *Wurthmann* was wrongly decided and should be overturned, asserting that "position of authority" under AS 11.41.434(a)(3)(B) should be limited to professional or quasi-professional adults who have authority over an underage person by virtue of their profession. But AS 11.41.470(5) defines the term to mean "employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, *babysitter*, or a *substantially similar* position, and a police officer or probation officer other than when the officer is exercising custodial control over a minor."[28] The statute does not require the adult to occupy a professional or quasi-professional position.

We do not find it necessary to revisit *Wurthmann*, as doing so would not invalidate Thompson's convictions. First, the State argued that, as J.C.'s "city guardian," Thompson filled a role in her life substantially similar to that of a babysitter pursuant to AS 11.41.470(5). The court of appeals noted that the evidence showed that Thompson

---

[25] *Id*. at 765.

[26] AS 11.41.434(a)(3).

[27] *Wurthmann*, 27 P.3d at 763.

[28] AS 11.41.470(5) (emphasis added).

"effectively functioned as J.C.'s surrogate parent or full-time sitter for weeks, and even months, while J.C. was living in Anchorage, away from her mother."[29] Thompson has not challenged the sufficiency of the evidence on this point; he also has not clearly explained how disavowing *Wurthmann*'s holding that "position of authority" can apply to live-in boyfriends would materially affect the State's theory that he occupied a role substantially similar to that of a babysitter.

Moreover, the only issue relevant to Thompson's case that was presented in Wurthmann's appeal was the scope of the term "position of authority"; Wurthmann was not prosecuted or convicted under alternative theories.[30] But the State in this case did not rely solely on the "position of authority" prong of AS 11.41.434(a)(3)(B). It also charged Thompson under an alternative theory: that he "resided" with J.C. and "had authority" over her pursuant to AS 11.41.434(a)(3)(A). The State presented evidence and argued this theory to the jury in addition to its presentation and argument of the "position of authority" theory. The court of appeals' interpretation in *Wurthmann* of "position of authority" — a term appearing in a different subsection of the statute — has no effect on this alternative theory of prosecution. Even if we were to adopt Thompson's proposed reading of "position of authority," it would not affect his convictions based upon this second theory. We are not persuaded to revisit or overrule *Wurthmann*.

B. **The Jury Was Properly Instructed On The Phrase "Position Of Authority."**

Thompson separately argues that the superior court "incorrectly responded to the jury's question[s]. It should have . . . referred them back to the instruction, and [told] them that 'substantially similar' pertains to the definitions in the instruction." The

---

[29]    *Thompson v. State*, 378 P.3d 707, 712 (Alaska App. 2016).

[30]    *Wurthmann*, 27 P.3d at 764; *see also* former AS 11.41.438(a)(2).

court of appeals held that the superior court's instructions to the jury in response to their questions were correct:

> The judge told the jurors that, if they found that Thompson's relationship to J.C. did not put him in any of the authority roles specifically listed in Instruction No. 31 (i.e., the ones specifically listed in AS 11.41.470(5)), then the jurors could consider whether Thompson's position amounted to some other authority role, but only if that other authority role was "substantially similar" to the ones listed in Instruction No. 31. . . . This is precisely what the statutory definition says.[31]

We use our independent judgment to determine the correctness of jury instructions.[32] But we agree with the court of appeals' conclusion that the superior court followed the statutory text in both of its responses to the jury's questions about the phrase "position of authority."[33]

Because the relevant statutory section ends its list with a general phrase including "substantially similar position[s],"[34] we turn to statutory canons to interpret its meaning. Under the *ejusdem generis* canon, the general phrase "substantially similar position" is qualified by the preceding specific list of positions.[35] Thus, as the superior

---

[31]     *Thompson*, 378 P.3d at 712-13.

[32]     *Long v. Arnold*, 386 P.3d 1217, 1220 n.5 (Alaska 2016) (quoting *Thompson v. Cooper*, 290 P.3d 393, 398 (Alaska 2012)).

[33]     *Thompson*, 378 P.3d at 712-13.

[34]     AS 11.41.470(5).

[35]     *See Cable v. Shefchik*, 985 P.2d 474, 480 (Alaska 1999) (stating that pursuant to the statutory construction doctrine of *ejusdem generis*, "a general term . . . when modified by specific terms . . . will be interpreted in light of those specific terms, absent a clear indication to the contrary" (quoting *State Farm Fire & Cas. Co. v. Bongen*, 925 P.2d 1042, 1046 (Alaska 1996))); *Alaska State Emps. Ass'n v. Alaska Pub. Emps.*
(continued...)

court instructed: "The jury may consider a broader list of authority figures/roles in its deliberation but the roles must be substantially similar, not slightly similar, to the list in instruction #31."

Thompson argues that the jury could not consider "a broader list of authority figures or roles . . . [and that] 'substantially similar' refers to the listed roles" exclusively. If Thompson were correct, then the phrase "substantially similar position" would be superfluous. But we "presume that no words or provisions [in a statute] are superfluous and that the legislature intended 'every word, sentence, or provision of a statute to have some purpose, force, and effect.' "[36]

The superior court's instruction and its response to the jury's questions followed the text of the statute. We therefore affirm the court of appeals' holding that the jury was properly instructed by the superior court.

### C. Distinct Acts Of Penetration Can Support Separate Convictions, Regardless Of The Penetrating Object Or Body Part.

#### 1. Constitutional framework for merger issues

The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ."[37] The federal double jeopardy clause binds the states through the Fourteenth

---

[35]  (...continued)
*Ass'n*, 825 P.2d 451, 460 (Alaska 1991) (defining *ejusdem generis* as "the general is controlled by the particular").

[36]  *State v. Fyfe*, 370 P.3d 1092, 1099 (Alaska 2016) (quoting *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 16 (Alaska 2014)).

[37]  U.S. Const. amend. V.

Amendment.[38]  Article I, section 9 of the Alaska Constitution also provides that "[n]o person shall be put in jeopardy twice for the same offense."[39]  In *Johnson v. State* we elaborated:  "The constitutional protection against double jeopardy . . . protects against multiple punishments for the same offense."[40]  We delineated the steps required of the court to determine whether separate convictions must merge for sentencing in *Whitton v. State*.[41]  *Johnson* reaffirmed that the *Whitton* rule remains the standard for determining whether convictions must merge pursuant to the Alaska Constitution:

> [I]n order to determine whether multiple punishment violates the Alaska Constitution, a court must first look to the intent, conduct, and societal interests at stake in the multiple offenses (or multiple counts of a single offense) that were defined by the legislature.  A court must then independently determine whether the differences among these purposes underlying the multiple offenses or counts are great enough that multiple punishments for the criminal conduct should lie.[42]

---

**38**     *Benton v. Maryland*, 395 U.S. 784, 794 (1969).  Thompson does not specifically raise a federal double jeopardy claim.  But to the extent this case implicates federal constitutional questions we note that the federal double jeopardy clause authorizes courts to enforce the legislature's intent to permit or preclude multiple charges or convictions relating to a single course of conduct.  *Johnson v. State*, 328 P.3d 77, 86-87 (Alaska 2014) (citing *Whalen v. United States*, 445 U.S. 684, 688-89 (1980)).  "Legislative intent is 'dispositive' of the federal constitutional question."  *Id.* at 87 (quoting *Whalen*, 445 U.S. at 689).

**39**     Alaska Const. art. I, § 9.

**40**     328 P.3d 77, 86 (Alaska 2014) (quoting *N. Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989) (internal quotation marks omitted)).

**41**     479 P.2d 302, 312 (Alaska 1970).

**42**     *Johnson*, 328 P.3d at 87-88 (citing *Whitton*, 479 P.2d at 312).

## 2.    Issues presented on appeal

In *Johnson* we held that "the harms from non-consensual sexual penetration of distinct orifices of the victim's body are so independently significant that multiple counts of sexual assault are permissible under the Alaska Constitution to vindicate the societal interest in preventing those harms and punishing the [harmful] conduct."[43]

Thompson and the State present competing arguments about our merger jurisprudence in the sexual assault and sexual abuse of a minor contexts. Thompson argues that we should hold that the rule announced in *Johnson v. State* does not apply to sexual abuse of a minor cases. He urges us to create a rule in such cases that would require merger of all convictions from a single episode of sexual activity. Referring to *Whitton*, Thompson argues that "the 'intent, conduct, and societal interests at stake' as 'defined by the legislature' of sexual assault differ from sexual abuse." He continues that statutes criminalizing "sexual assault protect[] against . . . non-consensual sex, meaning coerced sex. But what sexual abuse [laws] protect[] against is sex that is non-consensual by operation of law." He argues that the harm targeted by sexual abuse statutes is not "forcible or coerced" sex but rather the abuse of the power adults may hold over children. The prohibited conduct in Thompson's view is the "break of trust and misuse of power." He therefore urges us to hold that this power "is not separately abused with each distinct act that occurs in a criminal episode, or each distinct orifice that is penetrated." Thompson instead argues that there is a single violation of law each time an adult engages in an episode of sexual activity, regardless of the type and number of acts of penetration.

---

[43]    *Id.* at 89.

In its petition the State urges us to disavow the "distinct orifices" framework of *Johnson* and *Oswald v. State*[44] and hold instead that each separate act of penetration supports its own conviction and punishment, regardless of whether the distinct acts of penetration occurred in a single bodily orifice or separate bodily orifices. The State argues that *Johnson*'s rationale supporting separate convictions for separate acts of penetration in different orifices, like fellatio and vaginal intercourse, applies just as persuasively to separate acts of penetration in the same orifice, like digital penetration and vaginal intercourse.

### 3. The same rules for merger apply to both sexual abuse of a minor and sexual assault convictions.

Thompson argues that the policy goals and interests protected by different categories of sexual offense are so unique that they warrant different treatment for the purposes of merger. He asserts that sexual abuse of a minor cases differ from sexual assault cases because, in sexual abuse cases, sex that "is not forcible or coerced . . . is nevertheless considered non-consensual because it is an abuse of power by an older person of a child."

Thompson mischaracterizes the law in arguing that it is force or coercion that justifies different merger rules for sexual abuse of a minor and sexual assault. First, his assumption that sexual abuse cases do not involve coercion is faulty. Coercion is defined as the "[c]ompulsion of a free agent by physical, moral, or economic force or threat of physical force."[45] "Undue influence" is defined as "[t]he improper use of power

---

**44** 715 P.2d 276, 280 (Alaska App. 1986), *overruled in part as recognized by Yearty v. State*, 805 P.2d 987, 995 n.3 (Alaska App. 1991).

**45** *Coercion*, BLACK'S LAW DICTIONARY (10th ed. 2014) (also listing the phrase "undue influence" as a corollary definition to the related phrases "implied coercion" and "moral coercion").

or trust in a way that deprives a person of free will," or "the exercise of enough control" to overmaster another's free agency and induce that person to perform an act that "would not have otherwise been performed."[46] The concepts overlap, and both may characterize the coercive effect of an adult abuser's influence over a child. The "abuse of power" in many sexual abuse cases thus stems from the undue, coercive influence that the abuser exercises over the victim.[47]

Conversely, Thompson's argument ignores that sexual assault cases may not involve force or threat of force. For example, the definition of second degree sexual assault includes "sexual penetration with a person who the offender knows is (A) mentally incapable; (B) incapacitated; or (C) unaware that a sexual act is being committed."[48] None of these prohibited actions are "forcible": they do not involve the use or threat of physical violence. But such penetrations still violate an incapacitated victim's autonomy and bodily integrity.

---

[46]     *Undue Influence*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[47]     *See, e.g.*, *State v. Jackson*, 776 P.2d 320, 328 (Alaska 1989) (emphasizing the "breach of trust" inherent in defendant's sexual abuse of his gymnastics student); *Wurthmann v. State*, 27 P.3d 762, 766 (Alaska App. 2001) ("[A] reasonable jury could conclude that [Wurthmann] exercised undue influence over" the victim as her stepfather and primary caretaker).

[48]     AS 11.41.420(a)(3). "[I]ncapacitated" is defined as "temporarily incapable of appraising the nature of one's own conduct or physically unable to express unwillingness to act." AS 11.41.470(2). "[M]entally incapable" is defined as "suffering from a mental disease or defect that renders the person incapable of understanding the nature or consequences of the person's conduct, including the potential for harm to that person." AS 11.41.470(4).

The court of appeals addressed a related argument about the policy goals of the sexual assault and sexual abuse statutes in *Yearty v. State*.[49]  There the State argued that convictions for sexual assault and sexual abuse of a minor relating to the same course of conduct should not merge because the two types of offenses "involve different statutory elements and protect differing societal interests."[50]  The court of appeals disagreed, noting that both statutes serve the same basic aim:  "protect[ing] victims from socially unacceptable sexual contacts."[51]

The court in *Yearty* acknowledged that the sexual assault statute achieved this purpose by requiring affirmative proof of the victim's lack of consent, while the sexual abuse of a minor statute did so "by substituting the child's age (and the age of the defendant) for proof of actual lack of consent."[52]  But it rejected the argument that this difference reflected any shift in the purpose of the statute, instead noting "the legislature's practical recognition that a child of under thirteen years is incapable of giving meaningful consent to sexual contact."[53]  The court then concluded that because every sexual abuse of a minor case is thus legally nonconsensual, "it is difficult to conceive of a situation in which an act of sexual abuse on a child would not also be an act of sexual assault"[54] — a conclusion that reaffirmed the shared purpose of both types of statute.

---

[49]     805 P.2d 987, 994 (Alaska App. 1991).

[50]     *Id.*

[51]     *Id.*

[52]     *Id.*

[53]     *Id.*

[54]     *Id.*

We agree with the *Yearty* court's explication of the intent and societal interests prongs of *Whitton* in sex crimes and we see no reason to disturb it. The basic purpose of both sexual assault and sexual abuse of a minor statutes is to protect victims from offensive sexual conduct. Whether charged as sexual assault or sexual abuse of a minor, each offensive act is a violation of the victim's dignity, personal freedom, and bodily integrity.[55] We therefore hold that sexual abuse of a minor cases should be treated in the same manner as sexual assault cases to determine whether separate convictions should merge. The rule announced in *Johnson* applies to the same extent in both sexual assault cases and sexual abuse of a minor cases.[56]

4. **Separate convictions may stand for each separate act of penetration, regardless of whether it is the same or a different orifice.**

The court of appeals relied on its previous decision in *Oswald v. State* when it merged Thompson's convictions for acts of digital penetration, penetration by object, and penile penetration that occurred over similar time periods.[57] The State urges us to disavow *Oswald*'s characterization of an initial act of digital penetration as "foreplay" and its conclusion that such a preparatory step toward another act of penetration had to merge with the later act. In its place the State asks us to adopt a rule that separate convictions can enter for each separate act of penetration, regardless of whether the same or a different orifice was penetrated.

---

[55] *Johnson v. State*, 328 P.3d 77, 89 (Alaska 2014).

[56] We note as well that applying the *Johnson* rule to sexual abuse cases is consistent with legislative intent as required for federal double jeopardy purposes. *See Johnson*, 328 P.3d at 87-88.

[57] *Thompson v. State*, 378 P.3d 707, 716-17 (Alaska App. 2016).

### a.    *Oswald v. State* and its progeny

In *Oswald* the court of appeals accepted a concession from the State that "Count I [digital penetration] encompassed foreplay leading to the act of sexual intercourse charged in Count II, and consequently could not support a separate conviction."[58]  In contrast, the court found that a separate conviction should stand for a second act of sexual intercourse following a break in time from the first.[59]

A few years later in *Rodriquez v. State* the court of appeals differentiated between convictions for multiple instances of fellatio and anal penetration.[60]  The court held that because "fellatio . . . was not a necessary or inevitable predecessor to the later sodomy," these counts did not merge.[61]  For two different incidents of fellatio and anal penetration, the court held that separate convictions were appropriate because, as in *Oswald*, there was a sufficient break in time between the two acts.[62]  The court thus concluded that a completed sexual act followed by another, different, sexual act could support two convictions.[63]

In *Yearty v. State* the court of appeals again considered whether two separate sexual acts — fellatio followed by attempted anal penetration — could support

---

[58]    *Oswald v. State*, 715 P.2d 276, 280 (Alaska App. 1986), *acknowledged as overruled in part by Yearty v. State*, 805 P.2d 987, 995 n.3 (Alaska App. 1991).

[59]    *Id.* at 281.

[60]    741 P.2d 1200, 1207 (Alaska App. 1987).

[61]    *Id.*

[62]    *Id.*

[63]    *Id.* at 1207-08.

separate convictions.[64] The court of appeals held that they could, stating that separate convictions and sentences from a single episode of sexual assault or abuse were permissible when they were for different types of sexual penetration.[65] In a footnote the court acknowledged that the State had pointed out a potential inconsistency between *Rodriquez* and *Oswald*.[66] The court stated that "[t]o the extent that *Oswald* is inconsistent with our subsequent decision in [*Rodriquez*], we hold that the latter case overrules *Oswald*."[67]

The court of appeals more recently reiterated in *Iyapana v. State* that "[s]eparate convictions for multiple acts of penetration involving different openings of the victim's . . . body are permissible,"[68] explaining the acts merited separate punishment because "different types of penetration constitute different forms of indignity."[69] In a concurring opinion Chief Judge Mannheimer explained his understanding of the relationship between the court of appeals' decisions in *Oswald*, *Rodriquez*, and *Yearty*, clarifying that merger based upon the preparatory nature of a sexual act was appropriate only when both acts involved the same orifice:

> *Oswald* has been overruled *only* to the extent that it is inconsistent with *Rodriquez* — that is, only to the extent that *Oswald* would apparently require a merger of counts even when a defendant's preparatory act of sexual penetration

---

[64]  805 P.2d 987, 993 (Alaska App. 1991).

[65]  *Id.* at 993-94 (citing *Rodriquez*, 741 P.2d at 1207-08).

[66]  *Id.* at 995 n.3.

[67]  *Id.*

[68]  284 P.3d 841, 850 (Alaska App. 2012) (quoting *Johnson v. State*, 762 P.2d 493, 495 (Alaska App. 1988)).

[69]  *Id.*

involved a different *type* of penetration from the defendant's ultimate act of sexual penetration.

Thus, even after *Rodriquez* and *Yearty*, the result reached in *Oswald* remains correct: the defendant's preparatory act of penetrating the victim's vagina with his finger merged with the defendant's ensuing act of penetrating the victim's vagina with his penis — because the first penetration was preparatory to the second, and because both acts involved penetration of the same orifice.[70]

Against this history we were asked in *Johnson v. State* to review the court of appeals' decision upholding separate convictions for nonconsensual fellatio and vaginal intercourse.[71] We affirmed the separate convictions, holding that "the harms from non-consensual sexual penetration of distinct orifices of the victim's body are so independently significant that multiple counts of sexual assault are permissible . . . to vindicate the societal interest in preventing those harms and punishing the [harmful] conduct."[72]

Neither party in *Johnson*, however, asked that we examine whether penetration of separate orifices was *required* to impose separate sentences. The facts of that case were based upon the penetration of different orifices. But in agreeing with the court of appeals, we emphasized the policy goals of "preventing the loss of [the victim's] autonomy, dignity, free will, and bodily integrity," and observed that these harms "are revisited upon the victim with each distinct type of non-consensual sexual penetration."[73]

---

[70] *Id.* at 853 (Mannheimer, J., concurring) (emphasis in original).

[71] 328 P.3d 77, 89 (Alaska 2014).

[72] *Id.*

[73] *Id.*

We are now asked directly if penetration of separate orifices is required to support separate sentences.  We hold that it is not.

> **b.** **Distinct types of penetration, whether distinguished by penetrating object or body part, penetrated orifice, or both, do not merge.**

Applying *Johnson*'s "separate penetration" rule to the penetrating object or body part as well as to the penetrated orifice is consistent with both the federal and state double jeopardy provisions.  As we acknowledged in *Johnson*, the federal double jeopardy question turns on legislative intent.[74]  We determined there that "[n]othing in the criminal statute or the legislative history" evinced an intent to punish only once for penetration of multiple orifices of the victim's body.[75]

*Johnson* did not raise the question of whether the same reasoning applies to penetration of the same orifice by multiple objects or body parts,[76] but we see no reason that it should not.  Indeed, the legislature defined "sexual penetration" as "genital intercourse, cunnilingus, fellatio, anal intercourse, or an intrusion, however slight, of *an object or any part of a person's body* into the genital or anal opening of another person's body."[77]  This language demonstrates its intent to treat changes in both the manner of penetration and the penetrated orifice as separately punishable acts. Multiple convictions and sentences for distinct methods of penetration are therefore not required to merge.

To determine whether the legislature's intent satisfies the Alaska Constitution's double jeopardy clause, the *Whitton* test first requires us to "identify the

---

[74]     *Id.* at 86-87.

[75]     *Id.* at 87.

[76]     *Id.* at 89-90 (addressing only whether separate punishments could stand for Johnson's sexual penetration of the victim's vagina and mouth).

[77]     AS 11.81.900(b)(60)(A) (emphasis added).

societal interests at stake in charging, convicting on, and punishing multiple counts of sexual [abuse] in the first degree, including differences in [Thompson]'s intent and conduct and the consequences of his actions."[78] Second, we must decide "whether those societal interests are great enough" to justify multiple punishments for the conduct at issue, or whether multiple punishments are unconstitutional.[79]

The sexual abuse of a minor statutes, like the sexual assault statutes, aim "to protect victims from socially unacceptable sexual contacts."[80] The purpose of the statutes is to acknowledge and punish the distinct harms that are "revisited upon the victim with each distinct type of non-consensual sexual penetration."[81] Each act of penetration subjects a victim of sexual abuse to an additional "loss of autonomy, dignity, free will, and bodily integrity."[82] This is no less true when the acts of penetration differ by penetrating object or body part — such as digital followed by penile penetration — than when they differ by penetrated orifice. And it is no less true of acts of penetration that would be considered "preparatory" under the *Oswald* framework.[83]

Thompson argues that a rule allowing separate convictions for distinct penetrations of the same or separate bodily orifices will result in "every thrust of a penis

---

[78]     *Johnson*, 328 P.3d at 89 (citing *Whitton v. State*, 479 P.2d 302, 312 (Alaska 1970)).

[79]     *Id.*

[80]     *Yearty v. State*, 805 P.2d 987, 994 (Alaska App. 1991).

[81]     *Johnson*, 328 P.3d at 89.

[82]     *Id.*

[83]     *See Iyapana v. State*, 284 P.3d 841, 853 (Alaska App. 2012) (Mannheimer, J., concurring) (characterizing defendant's act of digital penetration in *Oswald*, which was held to merge with subsequent act of penile penetration, as "preparatory").

during penile-vaginal or penile-anal intercourse" potentially amounting to a "separate conviction and sentence." He analogizes to the application of the merger principle in assault cases, characterizing the relevant question as "whether the assaults occurred during a single, continuous episode."[84] He argues that a similar framework should apply in sexual abuse cases. But as the Washington Supreme Court noted in rejecting a similar argument, this argument "ignores key differences between the crimes of rape and assault. Unlike the rape statute, the assault statute does not define the specific unit of prosecution in terms of each physical act against a victim."[85] Thompson's argument likewise ignores that the unit of prosecution in sexual abuse cases is still defined as an act of "sexual penetration."[86]

This case for the first time squarely presents the question whether penetrations of the same orifice with different objects or body parts can support separate convictions. In *Johnson*, when we specifically affirmed separate convictions for the penetration of different orifices, the facts did not require us to consider merger given

---

**84**    *See, e.g.*, *Mill v. State*, 585 P.2d 546, 552 & n.4 (Alaska 1978) (holding that where defendant aimed a gun at victim, shot victim in leg, and then stood over victim to demand money, this "short and continuous sequence" of acts "amount[ed] to a unitary criminal episode"; and noting that separate convictions would likely raise double jeopardy concerns); *Miller v. State*, 312 P.3d 1112, 1118 (Alaska App. 2013) (holding that where defendant pushed victim against wall, strangled her, and then stepped on her chest, defendant's conduct was properly treated as "a single, continuous assault" and would have supported only a single conviction).

**85**    *State v. Tili*, 985 P.2d 365, 371 (Wash. 1999).

**86**    We also take notice of the State's explicit concession at oral argument that it does not interpret its own proposed rule to support charging every thrust as a separate offense, nor does it advocate such a rule.

penetration by different objects or body parts.[87]   And in *Oswald*, which did involve penetration of the same orifice by different body parts, the court of appeals accepted the State's concession that these acts would merge if not separated by a gap in time.[88]   In *Johnson* we reasoned that penetration of different orifices warranted separate convictions because each "distinct type of non-consensual penetration" visited additional harms upon the victim.[89]   We recognize now that whether the convictions Thompson challenges reflect "distinct types of non-consensual penetration" does not depend solely on the orifice that was penetrated.   Rather, the required inquiry is whether each act of penetration is sufficiently distinct from other acts to merit separate treatment.

After considering the interests of society to be vindicated or protected by the sexual abuse of a minor statutes (and sexual assault statutes), we conclude that a separate and distinct act of penetration occurs each time the penetrated orifice or the penetrating object or body part changes.   Each change in either the orifice or the penetrating object or body part inflicts a distinct violation of the victim's "autonomy, dignity, free will, and bodily integrity" and is sufficiently significant to warrant a separate conviction.[90]   We therefore reverse the court of appeals' holding that Thompson's convictions must merge and remand for further proceedings consistent with this opinion.

---

[87]   *Johnson*, 328 P.3d at 89-90.

[88]   *Oswald v. State*, 715 P.2d 276, 280 (Alaska App. 1986) ("The [S]tate concedes that Count I [digital penetration] encompassed foreplay leading to the act of sexual intercourse charged in Count II . . . [and] asks that the conviction for Count I be vacated, and Oswald joins in this request.  We . . . conclude that the parties' position is correct.").

[89]   *Johnson*, 328 P.3d at 89.

[90]   *Id.* at 89-90.

## V. CONCLUSION

We REVERSE the court of appeals' holding on the merger issues for Thompson's sexual abuse of a minor convictions but otherwise AFFIRM its decision.